# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

THOMAS ALLAN MCGUIRE,
     Petitioner,

v.                                Case No. 8:16-cv-1934-KKM-UAM

SECRETARY, DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____

## ORDER

Thomas Allan McGuire, a Florida prisoner, filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court convictions for sexual battery, child abuse, and contributing to the delinquency or dependency of a child. (Doc. 1.) Having considered the petition, (*id*.), the response opposing the petition as time-barred or alternatively as without merit, (Doc. 17), and the replies, (Docs. 26, 37-1), the petition is denied. Because reasonable jurists would not disagree, McGuire is also not entitled to a certificate of appealability.

## I.    BACKGROUND

### A. Procedural Background

A state-court jury convicted McGuire of three counts of sexual battery on a child while in a position of familial or custodial authority, one count of child abuse, and one count of contributing to the delinquency or dependency of a child. (Doc. 19, Ex. 1, at 111–15.) The state trial court sentenced him to an overall term of thirty years in prison. (*Id*. at 122–27.) The state appellate court per curiam affirmed the convictions and sentences, and denied McGuire's motion for rehearing. (*Id*., Exs. 4, 6.)

1

McGuire moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id*., Ex. 21, at 1–50.) He then filed an amended Rule 3.850 motion. (*Id.* at 51–100.) The state court held the amended motion in abeyance while McGuire appealed the denial of his motion to supplement the record.[1] (*Id.* at 104–05.) The state appellate court ultimately dismissed the appeal without prejudice, permitting McGuire to "refile a timely postconviction motion" with "any relevant attachments" and "any necessary 'Notice of Confidential Information within Court Filing.'" (*Id.*, Ex. 13.) McGuire subsequently filed a second amended Rule 3.850 motion. (*Id.*, Ex. 21, at 308–56.) The state court struck several grounds from the motion and allowed McGuire to "file a good faith amendment curing the pleading defects." (*Id.*, Ex. 21a, at 12.) McGuire attempted to amend, but the state court struck his pleading because it exceeded the page limit and included "facially insufficient" grounds. (*Id.* at 543–45.)

McGuire then filed a third amended Rule 3.850 motion. (Doc. 42-1 at 1–48.) The state court dismissed certain grounds as untimely and denied the remaining grounds on the merits; the state appellate court per curiam affirmed the denial of relief. (Doc. 19, Ex. 21a, at 895–913; *id.*, Ex. 24.) Next, McGuire unsuccessfully sought discretionary review with the Florida Supreme Court. (*Id.*, Exs. 27, 28, 29.) This federal habeas petition followed. (Doc. 1.)

### B. Factual Background[2]

---

[1] Before seeking relief under Rule 3.850, McGuire had moved to supplement his "case file" with several documents relevant to his forthcoming motion for postconviction relief. (Doc. 19, Ex. 8.) The state court denied the motion because the documents contained "confidential victim information" and McGuire had failed to make appropriate redactions. (*Id.*, Ex. 10.)

[2] The factual background is based on the trial transcript.

In the spring of 2008, McGuire and his sixteen-year-old biological daughter, A.M., lived in a one-bedroom apartment in Pinellas Park, Florida. (Doc. 19, Ex. 1c, at 298, 312–13.) A.M. had been living with McGuire "exclusively" since she was four years old. (*Id.* at 296.)

On the last Friday of the school year, A.M. got in trouble with McGuire for visiting a friend's house instead of "going straight home" after school. (*Id.* at 312.) McGuire told A.M. to "take all [her] stuff and leave." (*Id.* at 313.) A.M. spent the night at her boyfriend's house, where she drank alcohol and lost her virginity. (*Id.* at 314–15.) She spent the rest of the weekend at another friend's house. (*Id.* at 316.) When she went to school on Monday, the police arrested her and took her to a juvenile holding facility. (*Id.* at 317–18.) McGuire picked A.M. up from the facility, and the two began to argue. (*Id.* at 318–19.) She told him what had happened over the weekend, including that she had lost her virginity. (*Id.* at 319.) McGuire punished A.M. by, among other things, forcing her to sleep on the "couch or [] floor" in the living room, where McGuire also slept. (*Id.* at 313, 320.)

On the evening of July 6, 2008, McGuire returned home from a tattoo parlor he frequented. (*Id.* at 326.) He offered whiskey to A.M., telling her she needed to "learn [her] limit." (*Id.* at 328.) A.M. had four or five shots in the living room while McGuire taught her "how to play dice." (*Id.* at 329.) McGuire was drinking too. (*Id.* at 333.) Shortly after the dice game began, McGuire played pornography on the television, asking his daughter "if there was anything [she] liked." (*Id.* at 330–31.)

A.M. began to feel sick, so she went to the bathroom to throw up. (*Id.* at 332.) McGuire took a photograph of A.M. sitting on the floor by the toilet to commemorate her "first time being drunk with him." (*Id.* at 334–35.) Once A.M.

stopped feeling sick, McGuire helped her change into pajamas. (*Id.* at 337.) While the two were still in the bathroom, McGuire began to rub A.M.'s vagina. (*Id.* at 338–39.) A.M. said she wanted to go to bed, so McGuire helped her up and placed her on top of several pieces of "bedding" in the living room, including a blue sleeping bag and a green sleeping bag. (*Id.* at 341, 344–45; *id.*, Ex. 1d, at 559.) Once she was on the bedding, McGuire licked and digitally penetrated her vagina, then placed his penis inside it. (*Id.*, Ex. 1c, at 345–48.) When A.M. awoke the next morning, McGuire told her that what they had done "was natural," that it only "seemed bad because society makes it seem bad," and that she "had a pretty vagina." (*Id.* at 349–50.)

Two days later, a similar incident occurred. (*Id.* at 351.) McGuire and A.M. went to a grocery store to "get dinner." (*Id.* at 352–53.) In addition to purchasing food, however, McGuire also bought "Amaretto and blackberry grenadine." (*Id.* at 353.) The two returned to the apartment, where McGuire cooked dinner and let A.M. try the alcohol. (*Id.* at 353–54.) As A.M. and McGuire were drinking Amaretto, McGuire again put pornography on the television. (*Id.* at 355.) A.M. began to feel sleepy, so she lay down "between the couch and the coffee table" in the living room. (*Id.* at 356–57.) McGuire crawled under the coffee table and touched A.M.'s vagina over her clothing. (*Id.* at 360–61.) A.M. fell asleep, and when she awoke the next morning, McGuire told her he had performed oral sex on her vagina and "fingered" her anus. (*Id.* at 364.)

Following these two incidents, A.M. became "more of a girlfriend to [McGuire] than a daughter." (*Id.* at 366.) For example, McGuire (1) grabbed her buttocks when he hugged her, (2) made her "watch[] porn with him while he

touched himself," (3) masturbated while she posed naked for him, and (4) bought underwear for her that she was only allowed to wear inside the apartment. (*Id.* at 366, 372–75.) This conduct continued until the school year began. (*Id.* at 376–77.)

On November 10, 2008, A.M. was summoned to the principal's office because of a bruise on her underarm. (*Id.* at 384.) A.M. told the principal that McGuire had caused the bruise. (*Id.* at 384–85.) Law enforcement arrived, and A.M. eventually disclosed that her father had sexually abused her as well. (*Id.* at 385–87.)

Shortly thereafter, A.M. was taken to a police station, where she spoke with Detective Joseph Puglia. (*Id.*) Detective Puglia had A.M. conduct a "controlled call," in which A.M. would tell McGuire that she had been arrested after shoplifting a home pregnancy test at a Walmart, and that the test indicated she was pregnant. (*Id.*, Ex. 1d, at 477–80.) McGuire did not admit to having sex with A.M. during the call, but he repeatedly stated that he would not discuss the pregnancy on the phone because "they've got the f**king rooms bugged, [and] they've got hidden cameras." (*Id.* at 487.) He also said that he had assumed A.M. was at the police station because of "sex or beating you." (*Id.* at 482–83.)

Following the call, McGuire was arrested. (*Id.*, Ex. 1c, at 390.) A caseworker took A.M. to her apartment to retrieve some personal items. (*Id.*) A.M. picked up McGuire's sleeping bags as well as the underwear he had bought for her. (*Id.* at 390–91; *id.*, Ex. 1d, at 559–60.) Subsequent analysis identified McGuire's semen on the blue sleeping bag, but not the green one. (*Id.*, Ex. 1d, at 544–46.) A.M.'s DNA was not found on either item. (*Id.* at 553–54.)

## II.   TIMELINESS

Respondent contends that McGuire's petition is untimely. (Doc. 17 at 8–13.) The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Under AEDPA, a federal habeas petitioner has a one-year period to file a § 2254 petition. This limitation period begins running on the later of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). It is tolled for the time that a "properly filed application for State post-conviction or other collateral review" is pending in state court. 28 U.S.C. § 2244(d)(2).

The state appellate court affirmed McGuire's convictions on July 6, 2011, and denied his motion for rehearing on August 30, 2011. (Doc. 19, Exs. 4, 6.) His judgment became final 90 days later, on November 28, 2011, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Lowe v. Fla. Dep't of Corr.*, 679 F. App'x 756, 758 (11th Cir. 2017) ("[Petitioner's] conviction became final on March 10, 2010, 90 days after the denial of his motion for rehearing on direct appeal."). After 164 days of untolled time, on May 11, 2012, McGuire filed a motion for postconviction relief under Rule 3.850. (Doc. 19, Ex. 21, at 1.) As a result, the one-year clock was tolled until March 2, 2016—the date the mandate issued in McGuire's postconviction appeal. (*Id.*, Ex. 28.) At that point, 201 days remained on the limitation period. Accordingly, McGuire's § 2254 petition was due by September 20, 2016. He met the deadline—and thus satisfied the one-year limitation period—by filing his petition on June 30, 2016. (Doc. 1 at 1.)

Respondent resists this conclusion, arguing that two additional periods of untolled time should be included in the calculation. (Doc. 17 at 10–13.) First,

Respondent contends that the clock resumed on June 24, 2013, when the state appellate court (1) dismissed without prejudice McGuire's appeal of the denial of his motion to supplement the record, and (2) allowed him to "refile a timely postconviction motion" with "any relevant attachments" and "any necessary 'Notice of Confidential Information within Court Filing.'" (Doc. 19, Ex. 13.) According to Respondent, the clock ran until July 9, 2013, when McGuire filed an amended Rule 3.850 motion. (Doc. 17 at 10–11.) This argument fails. "[F]or the purposes of tolling under 28 U.S.C. § 2244(d)(2), a petitioner's Rule 3.850 motion is 'pending' until it is denied with prejudice." *Hall v. Sec'y, Dep't of Corr.*, 921 F.3d 983, 990 (11th Cir. 2019). The state appellate court did not deny McGuire's Rule 3.850 motion with prejudice. It simply allowed him to refile his motion in compliance with the procedures governing confidential information in court filings. Thus, the state appellate court's ruling did not cause the clock to start running again.

Second, Respondent argues that the amended Rule 3.850 motion that McGuire filed on January 12, 2015, had "no tolling effect" because the state court struck it for exceeding the page limit. (Doc. 17 at 11–12.) The Eleventh Circuit has made clear, however, that "the one-year limitations period [is] tolled the day a petitioner file[s] a procedurally noncompliant Rule 3.850 motion *if* he [is] permitted to and [] later file[s] a compliant motion." *Bates v. Sec'y, Dep't of Corr.*, 964 F.3d 1326, 1328 (11th Cir. 2020). Here, the state court granted McGuire leave to file a procedurally proper motion for postconviction relief, and McGuire complied by submitting his third amended Rule 3.850 motion. (Doc. 19, Ex. 21a, at 543–45;

Doc. 42-1 at 1–48.) Accordingly, the dismissal of the noncompliant Rule 3.850 motion did not cause the clock to resume.

Notably, even if the Court included the two additional periods of untolled time, McGuire's petition would still be timely. According to Respondent, the additional untolled time totaled 78 days. (Doc. 17 at 13.) As noted above, 164 days of untolled time passed before McGuire filed his first Rule 3.850 motion. Thus, on Respondent's calculation, 123 days remained on the limitation period as of March 2, 2016—the date the mandate issued in the postconviction appeal. That would give McGuire until July 5, 2016, to file a § 2254 petition. He met that deadline by filing his petition on June 30, 2016.

Because McGuire's petition is timely, the Court turns to consider whether he is entitled to relief on the grounds asserted in the petition.

## III.   <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

As noted above, the AEDPA governs this proceeding. *Carroll*, 574 F.3d at 1364. Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

8

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual

claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state-court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state-court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a

procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

McGuire brings claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the

12

particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

The second part requires showing that the deficient performance prejudiced the defense. *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## V.   ANALYSIS

### A. Grounds Twenty through Twenty-Seven Are Procedurally Defaulted

Respondent correctly contends that McGuire is not entitled to relief on Grounds Twenty through Twenty-Seven because they are procedurally defaulted. (Doc. 17 at 27–32.) Grounds Twenty through Twenty-Two raise claims of

ineffective assistance of counsel. Specifically, McGuire alleges that his trial counsel was ineffective for failing to challenge the chain of custody of the physical evidence obtained from his apartment (Ground Twenty); failing to challenge the "[u]nauthorized" DNA testing of the sleeping bags (Ground Twenty-One); and failing to present an alibi defense based on surveillance footage from a local grocery store (Ground Twenty-Two). (Doc. 1 at 23–27.) In Ground Twenty-Three, McGuire claims that the prosecution violated *Giglio v. United States*, 405 U.S. 150 (1972), by presenting false testimony from its DNA expert. (*Id.* at 27.) In Grounds Twenty-Four and Twenty-Five, McGuire alleges that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose two police reports. (*Id.* at 28-30.) And in Grounds Twenty-Six and Twenty-Seven, McGuire asserts that the prosecution committed "[f]raud on the [c]ourt" by presenting false testimony from Detective Puglia and "alter[ing] and manipulat[ing]" the recording of his "controlled call" with A.M. (*Id.* at 30–32.)

The state court dismissed each of these claims as untimely, explaining that they were first raised after the expiration of Rule 3.850's two-year limitation period.[3] (Doc. 19, Ex. 21a, at 896–98, 903–05.) A petitioner's failure to comply with state procedural rules governing the proper presentation of a claim generally bars federal review of that claim in a subsequent federal habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision . . . rests on a state

---

[3] A Rule 3.850 motion generally cannot be filed "more than 2 years after the judgment and sentence become final." Fla. R. Crim. P. 3.850(b). Although an amended Rule 3.850 motion generally relates back to the original Rule 3.850 motion's filing date, any "[n]ew claims for relief contained in an amendment need not be considered by the court unless the amendment is filed within the [two-year] time frame specified in subdivision (b)." Fla. R. Crim. P. 3.850(e).

law ground that is independent of the federal question and adequate to support the judgment."); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."). A state court's rejection of a petitioner's federal constitutional claim on state procedural grounds precludes federal review if the state procedural ruling rests on an "independent and adequate" state-law ground. *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d 1183, 1212 (11th Cir. 2009); *see also Kimbrough v. Sec'y, Fla. Dep't of Corr.*, 809 F. App'x 684, 691–92 (11th Cir. 2020); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim, (2) the state court's decision rests solidly on state-law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516–17 (11th Cir. 1990)). A rule must be firmly established and regularly followed by state courts to be considered adequate to foreclose review of a federal claim. *Lee v. Kemna*, 534 U.S. 362, 376 (2002) ("[V]iolation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim.").

The state court's ruling that McGuire's claims were untimely under Rule 3.850 constitutes an independent and adequate state-law ground for denial that procedurally bars the claims from federal habeas review. *See Kimbrough*, 809 F.

App'x at 692. The state court clearly and expressly stated that it was relying on state procedural rules to resolve the federal claims.[4] Further, the state court's decision on the procedural issue rested entirely on state-law grounds and was not intertwined with an interpretation of federal law. *See Judd*, 250 F.3d at 1313. Florida courts regularly follow the firmly established rules prohibiting an untimely state postconviction motion. *See, e.g., State v. Williams*, 854 So. 2d 215, 217 (Fla. 1st DCA 2003) ("Because Appellee's motion was filed more than two years after his convictions became final, we agree with the State that Appellee's double jeopardy claim is time barred.); *Owen v. State*, 854 So.2d 182, 187 (Fla. 2003) ("A second or successive motion for postconviction relief can be denied on the ground that it is an abuse of process if there is no reason for failing to raise the issues in the previous motion . . . . [C]laims that could have been raised in a prior postconviction motion are procedurally barred."). Accordingly, Grounds Twenty through Twenty-Seven are procedurally defaulted.

McGuire must show either cause and actual prejudice or a miscarriage of justice to excuse the procedural default. *See Mincey v. Head*, 206 F.3d 1106, 1135 (11th Cir. 2000) ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and independent state procedural rule, unless the petitioner can show 'cause' for the

---

[4] To be sure, the state court also ruled that, even if the claims were timely, they would fail on the merits. (Doc. 19, Ex. 21a, at 896–98, 903–05.) But "[t]he court's identification of an alternative ground for denial does not change that it denied the [claims] for failure to comply with Rule 3.850." *Kimbrough*, 809 F. App'x at 692; *see also Harris*, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." (emphasis omitted)).

16

default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'"). McGuire fails to demonstrate cause and prejudice excusing the procedural default. *See Carrier*, 477 U.S. at 495–96.[5] He cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because McGuire satisfies neither exception to procedural default, Grounds Twenty through Twenty-Seven are procedurally barred from federal review.

### B. Ground One—Denial of Motion to Suppress

In Ground One, McGuire contends that the trial court erred in denying his motion to suppress evidence. (Doc. 1 at 4.) As noted above, after McGuire was arrested, A.M. returned to their apartment to retrieve several items, including the underwear McGuire had bought for her and his two sleeping bags. (Doc. 19, Ex. 1c, at 390–91; *id.*, Ex. 1d, at 559–60.) In his motion to suppress, McGuire argued that these items were "the product of an illegal search and seizure" because Detective Puglia arranged for A.M. to retrieve them without securing a search warrant or McGuire's consent. (*Id.*, Ex. 1, at 14–15.)

A federal court's review of a state prisoner's habeas petition raising claims arising under the Fourth Amendment is limited. In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground

---

[5] McGuire seeks to excuse the default of his *Brady* claims on the ground that the prosecution withheld the two police reports until after his "entry into the Florida prison system." (Doc. 37-1 at 48–56.) The record reflects, however, that McGuire possessed both reports by December 2012 at the latest—well within Rule 3.850's two-year statute of limitations. (Doc. 19, Ex. 21, at 138; *id.*, Ex. 8.) Thus, McGuire has not established cause for his failure to timely assert the *Brady* claims.

that evidence obtained in an unconstitutional search or seizure was introduced at his trial," *id.* at 482; *see also Lynch v. Sec'y, Fla. Dep't of Corr.*, 776 F.3d 1209, 1219 n.8 (11th Cir. 2015) (noting that under *Stone*, "[n]ormally, prisoners cannot raise Fourth Amendment issues in a § 2254 petition").

"An 'opportunity for full and fair litigation' means just that: an opportunity." *Lawhorn v. Allen*, 519 F.3d 1272, 1287 (11th Cir. 2008) (quoting *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978)). Thus, federal habeas corpus review is barred "[i]f a state provides the processes whereby a defendant can obtain full and fair litigation of a [F]ourth [A]mendment claim." *Id.* (quoting *Caver*, 577 F.2d at 1192). To provide a petitioner an opportunity for the full and fair litigation of his Fourth Amendment claim, the state court must make essential findings of fact when presented with contested facts. *See Mason v. Allen*, 605 F.3d 1114, 1120 (11th Cir. 2010); *Bradley v. Nagle*, 212 F.3d 559, 564–65 (11th Cir. 2000); *Hearn v. Florida*, 326 F. App'x 519, 522 (11th Cir. 2009).

*Stone* bars Ground One because the state courts gave McGuire "an opportunity for full and fair litigation" of his motion to suppress. *Stone*, 428 U.S. at 482. The trial court held an evidentiary hearing on McGuire's motion. (Doc. 19, Ex. 1, at 38–65.) Detective Puglia, A.M., and A.M.'s caseworker testified. (*Id.* at 34.) Then, after hearing argument from counsel, the court made factual findings and orally denied the motion, reasoning that (1) A.M. "had equal rights to all of the items that were collected in this particular case," and (2) in any event, "the Fourth Amendment doesn't apply" because "this [was] a private search by an individual [i.e., A.M.]." (*Id.* at 44.) Following his conviction and sentencing, McGuire appealed the denial of his motion to suppress. (*Id.*, Ex. 2.) The state appellate court

affirmed without opinion. (*Id.*, Ex. 4.) Under these circumstances, *Stone* precludes federal habeas review of McGuire's Fourth Amendment claim.

McGuire appears to contend that *Stone* does not apply because the trial court's ruling was, in his view, incorrect. (Doc. 37-1 at 14–15.) But the *Stone* bar "still applies despite a state court error in deciding the merits of a defendant's [F]ourth [A]mendment claim." *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980) (citing *Swicegood v. Alabama*, 577 F.2d 1322, 1324–25 (5th Cir. 1978)).[6] Indeed, "[i]f the term 'fair hearing' means that the state courts must correctly apply federal constitutional law, *Stone* becomes a nullity." *Swicegood*, 577 F.2d at 1324. Because the state courts gave McGuire a full and fair opportunity to litigate his motion to suppress, Ground One is barred from federal habeas review.

### C. Grounds Two, Six, and Seven—Failure to Adequately Litigate Motion to Suppress

McGuire argues that trial counsel rendered ineffective assistance with respect to his motion to suppress.[7] In Ground Two, McGuire contends that counsel failed to "[a]dequately" depose A.M., "resulting in an unsuccessful attempt at suppression of seized evidence." (Doc. 1 at 5.) In Ground Six, McGuire faults counsel for failing to cross-examine A.M.'s caseworker at the suppression hearing, "in addition to ineffectively [cross] examining lead detective Puglia" and A.M. (*Id.* at 9.) And in Ground Seven, McGuire claims that counsel was ineffective for failing

---

[6] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[7] The *Stone* bar does not "extend[] to Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue." *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986).

to call him to testify at the suppression hearing. (*Id.*) The state postconviction court denied each of these claims. (Doc. 19, Ex. 21a, at 898–900.)

*Ground Two.* The court began by addressing McGuire's contention that counsel failed to adequately depose A.M. (*Id.* at 898.) As the court explained, McGuire alleged that "if counsel had asked certain questions at deposition, counsel could have determined that [McGuire] denied the victim access to his bedroom, that she did not possess keys to his home because he did not trust her, and that Detective [] Puglia specifically discussed certain evidence with the victim before the victim seized [McGuire's] property." (*Id.*) The court rejected this ineffective-assistance claim for lack of prejudice. (*Id.*) The court reasoned that (1) McGuire was "not prejudiced by counsel not learning this [information] at deposition" because he admitted that he "told counsel almost all of this information," (2) Detective Puglia conceded "at the hearing on the motion to suppress that he discussed specific evidence with [A.M.], which was the only piece of information [McGuire] [did] not allege he told counsel," and (3) "none of this information would have changed the [c]ourt's conclusion that [A.M.] was not an agent of the state." (*Id.* at 898–99.)

The state postconviction court reasonably rejected this claim. To show prejudice under *Strickland*, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As explained above, the trial court denied the motion to suppress on two separate, independently sufficient grounds: first, that A.M. had "equal access" to the items she took from the apartment, and

second, that the Fourth Amendment did not apply because A.M. was not acting as an agent of the state when she obtained the items. (Doc. 19, Ex. 1, at 75.)

The second holding rested on the well-established rule that "[a] search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). In determining whether a private citizen acted as a government agent, courts consider "two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Id.* Courts also "consider whether the government 'openly encouraged or cooperated in the search.'" *United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985).

McGuire failed to establish a reasonable probability that, had counsel uncovered additional information from A.M., the court would have found that she "act[ed] as an instrument or agent of the government." *Steiger*, 318 F.3d at 1045. Whether A.M. had access to McGuire's bedroom or possessed keys to the apartment was irrelevant to the question of whether she was an agent of the state. To be sure, McGuire also argued that A.M. "would have revealed" that Detective Puglia "specifically discuss[ed]" "potential evidence" with A.M. before she entered the apartment. (Doc. 42-1 at 15–16.) But, as the state postconviction court noted, Detective Puglia admitted as much at the evidentiary hearing. (Doc. 19, Ex. 1, at 39–40.) Despite that admission, the trial court concluded that Detective Puglia "did not make [A.M.] an agent of his authority to search." (*Id.* at 73.) The court based that conclusion on Detective Puglia's testimony that "[h]e specifically told [A.M.] not to search" the apartment. (*Id.*) Thus, nothing in Ground Two calls into

question the trial court's independently sufficient holding that A.M. conducted a "private search" that did not implicate the Fourth Amendment. (*Id.* at 75.) As a result, there is no reasonable probability that, had counsel elicited additional information from A.M., the outcome of the suppression motion would have been different.

*Ground Six.* The state postconviction court likewise rejected McGuire's claim that counsel was ineffective for failing to adequately cross-examine Detective Puglia, A.M., and A.M.'s caseworker during the suppression hearing. (*Id.*, Ex. 21a, at 899–900.) As the court explained, McGuire "set[] out several lists of questions that he claims counsel should have asked the witnesses to show that the victim did not have common authority over the bedroom."[8] (*Id.* at 899.) But McGuire did not "indicate how [Detective Puglia or the caseworker] would have answered these questions," and he merely asserted that A.M. "'could/would have more than likely' answered the questions in a certain way." (*Id.*) Accordingly, the court concluded that McGuire was not "entitled to relief" because, among other things, he failed to "allege how the witnesses would have answered the[] questions or only allege[d] possible answers for these questions." (*Id.*) That conclusion was a reasonable application of *Strickland*. *See, e.g., McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021) (noting that "a petitioner's own assertions about whether and how a witness would have testified are usually not

---

[8] For example, McGuire argued that counsel should have asked Detective Puglia whether he believed that A.M. "possessed common authority or consented access to McGuire's bedroom," and whether he "asked A.M. if there were areas of the home she was not allowed access to." (Doc. 42-1 at 18.) McGuire also claimed that counsel should have asked the caseworker "[w]hether she knew or ever asked A.M. why she did not possess her own set of keys." (*Id.* at 19.) And McGuire faulted counsel for not asking A.M. "[w]hy her father changed the locks and installed a deadbolt lock on his bedroom door." (*Id.* at 20.)

enough to establish prejudice" (collecting cases)); *Hutchinson v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2893-KKM-SPF, 2021 WL 1193185, at *7 (M.D. Fla. Mar. 30, 2021) ("Because he never presented evidence of [the witness's] purported testimony, [petitioner's] [ineffective-assistance] claim is too speculative to warrant relief.").

*Ground Seven.* The state postconviction court also rejected McGuire's claim that counsel was ineffective for failing to call him to testify at the suppression hearing. (Doc. 19, Ex. 21a, at 899–900.) According to McGuire, he could have explained that A.M. did not have permission to enter the apartment, that "he had changed the locks to the home" and "installed a deadbolt on his bedroom door," and that he never gave A.M. a key to the apartment. (Doc. 42-1 at 21.) The court held that this "testimony would not have changed the outcome of the hearing" because "consent was not necessary to justify the search." (Doc. 19, Ex. 21a, at 899–900.) Specifically, although the trial court "did conclude that the victim had common authority to give consent," the "determination that the victim was not an agent of the [s]tate would have been dispositive if it had not." (*Id.* at 900.) The state postconviction court correctly rejected this claim for lack of prejudice. As with Ground Two, nothing in Ground Seven calls into question the trial court's independently sufficient finding that A.M. conducted a private search that did not implicate the Fourth Amendment.

For these reasons, McGuire is not entitled to relief on Grounds Two, Six, or Seven.

### D. Ground Three—Failure to Adequately Depose State DNA Expert

In Ground Three, McGuire contends that trial counsel provided ineffective assistance by failing to "[c]onduct [an] [a]dequate [d]eposition" of the State's DNA

expert. (Doc. 1 at 6.) The DNA expert ultimately testified at trial that (1) McGuire's semen was found on one of the two sleeping bags that A.M. had retrieved from the apartment, and (2) A.M.'s DNA was not found on either item. (Doc. 19, Ex. 1d, at 544–46, 553–54.) McGuire claims that, three weeks after the trial court denied his motion to suppress, counsel "conducted a 5-minute, unsworn telephonic deposition" of the DNA expert. (Doc. 1 at 6.) McGuire faults counsel for "neglect[ing] to question" the expert about "prior [c]ourt authorization/warrant for testing; chain-of-custody; and additional relevant material factors/issues." (*Id.*) According to McGuire, "the pertinent information obtained from the material questions could/would have provided the [d]efense with the knowledge to understand the legal and scientific assessments connected with defending against the charged crimes," and counsel "could/would have utilized [the expert's] deposition testimony as impeachment evidence." (Doc. 42-1 at 30.)

The state postconviction court rejected this claim on the grounds that it was "speculative" and McGuire "was not prejudiced." (Doc. 19, Ex. 21, at 904.) The court noted that McGuire did not "indicate how [the expert] would have answered any of these questions, and accordingly only speculate[d] that her answers would be helpful to his case." (*Id.*) Nor did McGuire explain how "these questions would have changed the outcome of the trial other than a conclusory assertion that unspecified 'pertinent information' would have given him understanding of legal and scientific assessments." (*Id.*) The court also rejected as "speculati[ve]" McGuire's "suggestion that the deposition might have proven to be inconsistent with trial testimony." (*Id.*)

The denial of this claim was reasonable. As the state court explained, McGuire simply asserted, without any factual support, that the DNA expert would have testified favorably to the defense had counsel conducted a more thorough deposition. Such speculation is plainly insufficient to establish prejudice under *Strickland*. *See Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016) ("Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [petitioner's] claims is mere speculation and does not entitle him to habeas relief."); *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (holding that state court reasonably rejected *Strickland* claim because "[i]t [was] speculative that an expert witness would in fact have testified" the way petitioner wanted); *Moore v. Sec'y, Fla. Dep't of Corr.*, No. 3:06-cv-127-MMH, 2022 WL 4133198, at *23 (M.D. Fla. Sept. 12, 2022) ("[Petitioner's] claim about the testimony of expert witnesses is speculative because he does not specify the substance of the proposed experts' testimony, and he presumes the experts would have testified favorably to the defense."). Thus, Ground Three is denied.

### E. Ground Four—Failure to "Investigate and Provide Discovery"

In Ground Four, McGuire contends that trial counsel was ineffective for failing to provide him with "several important discovery items" before trial. (Doc. 1 at 7.) He also faults counsel for failing to "investigate and/or obtain any of [the] evidence" he "recommended," including "reports, records, and witnesses." (*Id.*) In his Rule 3.850 motion, McGuire pointed to several "[e]xamples of information relayed to counsel," including A.M.'s "[s]chool records," a "family custody transcript," and two police reports. (Doc. 42-1 at 46.) He also asserted that, had

counsel provided him with the "discovery items" he requested and pursued the "information he relayed," he "would have been adequately informed and able to make important decisions," and counsel "could/would have had the ability to effectively defend [him] with the additional witnesses/evidence." (*Id.* at 46–47.)

The state postconviction court reasonably rejected this claim as "conclusory" because McGuire "fail[ed] to specifically allege prejudice." (Doc. 19, Ex. 21a, at 911.) The court held that McGuire did not show prejudice from the failure to provide him with discovery materials because he never "explain[ed] how being 'adequately informed' would have changed the outcome of the trial." (*Id.*) That conclusion was a reasonable application of *Strickland*. *See United States v. Ziolkowski*, No. 1:12-cr-12-MW-GRJ, 2017 WL 4479369, at *7 (N.D. Fla. Sept. 19, 2017) ("Even assuming for the sake of argument Petitioner could show that counsel's failure to provide copies of discovery materials amounts to deficient performance, Petitioner fails to demonstrate how revealing these documents to Petitioner would reasonably have changed the result of the proceedings."). The court also correctly observed that, although McGuire "briefly mention[ed] the names of witnesses . . . and documents," he failed to "allege what those witnesses would have testified to or what the documents would have proven." (Doc. 19, Ex. 21a, at 911–12.) McGuire's "[s]peculation [was] insufficient to carry [his] burden . . . as to what evidence could have been revealed by further investigation." *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) (citation omitted). Accordingly, Ground Four is denied.

### F. Ground Five—Failure to Request "Sworn Statement"

In Ground Five, McGuire alleges that trial counsel was ineffective for failing to "require the State to produce a sworn statement" from A.M. (Doc. 1 at 8.) According to McGuire, the State was required to "possess [] sworn testimony to support the criminal allegations" in the information. (*Id.*) Yet A.M. allegedly did not "provide[] any sworn statement to either law enforcement or State prosecutors" until her May 2009 deposition. (*Id.*) In his Rule 3.850 motion, McGuire contended that, had counsel requested a sworn statement from A.M., she would have learned that A.M. "never provided a sworn statement to anyone." (Doc. 42-1 at 48.) At that point, according to McGuire, "counsel could have moved for dismissal, which . . . could have more than likely afforded the State an opportunity to obtain a sworn statement and amend its [i]nformation." (*Id.*) McGuire also claimed that, "if obtained," A.M.'s sworn statement "could/would have been utilized for impeachment purposes." (*Id.*)

The state postconviction court rejected this claim. It began by pointing out that, under Florida law, "no documentation of the material witness statement is required." (Doc. 19, Ex. 21a, at 912.) The court explained that Florida Rule of Criminal Procedure 3.140(g) "merely requires the State Attorney or Assistant State Attorney to 'receive testimony under oath' before signing the information," and that the "testimony need not be accompanied by a written affidavit [or] filed in the Court." (*Id.*) The court also rejected as "pure speculation" McGuire's assertion that "the State never took testimony" from A.M. (*Id.*) And the court noted that McGuire "essentially admit[ted] that he was not prejudiced because, even if the State had not taken testimony from a material witness, the State could simply refile the

charges after doing so." (*Id.* (citing *State v. Pendergrass*, 997 So. 2d 518, 518 (Fla. 1st DCA 2008)).

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the state court found that counsel was not ineffective for failing to seek a sworn statement because, under Florida law, "no documentation of the material witness statement is required," and "even if the State had not taken testimony from a material witness, the State could simply refile the charges after doing so." (Doc. 19, Ex. 21a, at 912.) Thus, the state court "already has told us how the issues would have been resolved under state law had [counsel] done what [McGuire] argues [s]he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). This Court is bound to defer to that determination.

McGuire also asserted that, had counsel obtained a sworn statement from A.M., it "could/would have been utilized for impeachment purposes." (Doc. 42-1 at 48.) But McGuire offered no evidence that a sworn statement from A.M. would have contained testimony that could be used to impeach her at trial. As noted above, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice." *McKiver*, 991 F.3d at 1365; *see also United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not

sustain an ineffective assistance claim."). Because the state court reasonably rejected McGuire's ineffective-assistance claim, Ground Five is denied.

### G. Grounds Eight and Nine—Failure to Investigate and Call Witnesses (A.M.'s Classmates and Family Counselors)

In Ground Eight, McGuire contends that trial counsel was ineffective for failing to investigate and call three potential witnesses: S.S, K.C., and R.S. (Doc. 1 at 11.) All three attended school with A.M. (*Id.*) In his Rule 3.850 motion, McGuire asserted that S.S. was "romantically involved" with A.M. at the time of his arrest, was "familiar with A.M.'s deceitful and manipulative character," and knew of "the strenuous [sic] relationship between A.M. and her father." (Doc. 42-1 at 27.) Thus, McGuire argued, S.S. "could/would have testified that A.M. did possess the propensity to fabricate false allegations." (*Id.*) As for K.C. and R.S., A.M. allegedly told them about McGuire's sexual abuse. (*Id.*) According to McGuire, K.C. and R.S. "were familiar with [his] strict parenting, but were also aware of his active and loving relationship with A.M., and both could/would have not believed [he] could commit a crime against A.M." (*Id.*) McGuire claimed that "an investigation by counsel could/would have shed light on the specifics of what A.M. actually told" K.C. and R.S. (*Id.*)

In Ground Nine, McGuire faults counsel for failing to investigate and call Kim Crawford and Deborah Stenmark, both of whom conducted "family counseling sessions" with McGuire and A.M. (Doc. 1 at 12.) According to McGuire, the counselors "were both familiar with McGuire's strict parenting, AM.'s lack of veracity, and her propensity to, and history of[,] fabricating allegations, as revealed in previous sessions." (Doc. 42-1 at 28.) McGuire argues that the

counselors "could have provided valuable insight and also assist[ed] the [d]efense with verifying [A.M.'s] lack of veracity." (Doc. 1 at 12.)

The state postconviction court rejected Grounds Eight and Nine because they were "conclusory and speculative." (Doc. 19, Ex. 21a, at 902.) The court explained that McGuire "set out only vague descriptions of possible testimony with little indication of what the witnesses would actually have said if they had testified." (*Id.*) The court also found that "most of this testimony" would have been "cumulative." (*Id.*) As the court correctly recounted, A.M. "admitted [at trial] that she had lied to police and in court proceedings on prior occasions, testified that she did not like [McGuire's] strict parenting style, and admitted that she had previously said she wanted to get out of [his] house." (*Id.*; *see also id.* Ex. 1c, at 401–15, 434–46.)

The rejection of these claims was reasonable. The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver*, 991 F.3d at 1365. And, as noted above, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice." *Id.* Thus, McGuire's vague speculation as to what these witnesses would have testified to was insufficient to support an ineffective-assistance claim. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

The state court also reasonably concluded that much of the proposed testimony would have been cumulative. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260–61 (11th Cir. 2012)). Here, as the state court correctly explained, A.M. admitted at trial that she had previously lied about her relationship with her father "to police and in court proceedings." (Doc. 19, Ex. 21a, at 902.) Thus, any additional testimony about A.M.'s "history of fabricating allegations" would have been cumulative. (Doc. 42-1 at 28.) As for what A.M.'s schoolmates might have testified about what A.M. said to them, McGuire merely speculates and fails to show how the state court unreasonably concluded that he failed to show counsel was ineffective.

Grounds Eight and Nine are denied.

## H. Ground Ten—Failure to Investigate and Call Witnesses (Police Officers)

In Ground Ten, McGuire contends that trial counsel was ineffective for failing to investigate and call three police officers who were involved in an incident that took place "[a]pproximately 36 hours" before McGuire was arrested. (Doc. 1 at 13.) During this incident, A.M. called the police and falsely accused him of

"lock[ing] her out of their home." (*Id.*) The responding officers interviewed A.M., who "admitted to fabricating the event as she was angry with [McGuire] for not allowing her to bring her new cellphone into the home." (*Id.*) McGuire contends that, if called to testify at trial, the officers would have "assist[ed] with challenging [A.M.'s] veracity." (*Id.*)

The state postconviction court rejected this claim for lack of prejudice. (Doc. 19, Ex. 21a, at 902.) The court explained that the officers' testimony would "have been cumulative" because A.M. "admitted [at trial] the facts of the incident that these officers witnessed." (*Id.*) Indeed, counsel extensively cross-examined A.M. about the incident. (*Id.*, Ex. 1c, at 442–46.) During this part of her testimony, A.M. recounted that (1) McGuire did not lock her out of the apartment, (2) she at first told law enforcement that she was "locked out," and (3) she eventually admitted to the officers that she "wasn't locked out[;] [she] just wasn't allowed in with [her] cell phone." (*Id.*) Because the officers' testimony would have been cumulative, the court reasonably rejected this claim for lack of prejudice. *See Tanzi*, 772 F.3d at 660 ("[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." (quoting *Holsey*, 694 F.3d at 1260–61)). Thus, Ground Ten is denied.

### I. Ground Eleven—Failure to Retain "Independent" DNA Expert

In Ground Eleven, McGuire argues that trial counsel provided ineffective assistance by advising him that "an independent DNA expert was not necessary." (Doc. 1 at 14.) As noted above, the prosecution's DNA expert testified at trial that

(1) McGuire's semen was found on one of the two sleeping bags that A.M. had retrieved from the apartment, and (2) A.M.'s DNA was not found on either item. (Doc. 19, Ex. 1d, at 544–46, 553–54.) McGuire contends that he "was unaware of the minimal testings performed and was not provided access to or copies of the tests and results until his conviction was adjudicated." (Doc. 1 at 14.) According to McGuire, an "independent expert" could have (1) "performed testing on all items seized . . . in order to conclusively exclude A.M.'s presence," (2) explained to the jury the "limited and prejudicial isolated testing performed by the State's expert, which was conducted to only benefit the State," and (3) helped counsel "formulat[e] effective deposition and trial questions for the State's witnesses." (Doc. 42-1 at 45.)

The state postconviction court reasonably rejected this claim on the grounds that "counsel was not deficient" and McGuire "was not prejudiced." (Doc. 19, Ex. 21a, at 911.) The court explained that "the absence of [A.M.'s] DNA on [McGuire's] sleeping bag would not have proven his innocence." (*Id*.) Indeed, as the court pointed out, the prosecution's DNA expert "testified multiple times that she did not identify [A.M.'s] DNA or anyone's DNA except [McGuire's]." (*Id*.; *see also id*., Ex. 1d, at 549–50, 554–55.) And McGuire's counsel "reiterated that [A.M.'s] DNA was not found without objection in closing argument." (*Id*., Ex. 21a, at 911; *see also id*., Ex. 1e, at 678–79.) The jury nevertheless found McGuire guilty on all counts. Thus, the court concluded that, "even in the best-case scenario, an independent DNA expert's testimony would be consistent with the State's expert, and would not conclusively prove [McGuire's] innocence." (*Id*., Ex. 21a, at 911.) That conclusion was a reasonable application of *Strickland*. *See Van Poyck*, 290 F.3d at

1324 n.7 ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative.").

The state court also reasonably applied *Strickland* when it found that McGuire "offer[ed] no explanation for how the State's testing was 'conducted only to benefit the state.'" (Doc. 19, Ex. 21a, at 911.) Although McGuire asserts that the prosecution's expert performed only "minimal testings," he provides no evidence to support this assertion. (Doc. 1 at 14.) Nor does he present any basis to conclude that an independent expert would have found fault with the State DNA expert's methods or conclusions. "Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [McGuire's] claims is mere speculation and does not entitle him to habeas relief." *Finch*, 643 F. App'x at 852.

McGuire also claimed that an independent expert would have helped counsel "formulat[e] effective deposition and trial questions for the State's witnesses." (Doc. 42-1 at 45.) But McGuire never explained how an expert would have assisted counsel in this task. Nor did he specify the "deposition and trial questions" that an expert would have helped "formulat[e]." (*Id.*) McGuire's speculation on this score was insufficient to meet his burden under *Strickland*. *See Johnson*, 256 F.3d at 1187 ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner."). Accordingly, Ground Eleven is denied.

### J. Ground Twelve—Failure to "Prepare and Advise"

In Ground Twelve, McGuire contends that trial counsel was ineffective for failing to "prepare him for trial." (Doc. 1 at 15.) He elaborated on this claim in his Rule 3.850 motion, alleging that counsel failed to "properly advise him regarding his right to testify at trial." (Doc. 42-1 at 43.) According to McGuire, he "continuously informed counsel" that he wished to testify "in order to relay his version of events to the jury and personally deny all allegations on the record." (*Id.*) McGuire's claim, at bottom, is that counsel gave him deficient advice about the potential benefits and harms of testifying, not that McGuire was unaware of his right to testify.

The morning of the third day of trial, counsel allegedly "guarantee[d]" the "successful impeachment of A.M. and assured [McGuire] that he would be home eating steak tomorrow night." (*Id.*) Counsel also told McGuire that, "if he testified, the State could/would attack his credibility[] due to his 1992 misdemeanor conviction of a dishonest crime (i.e., Petit Theft)." (*Id.*) As a result, McGuire waived his right to testify, thereby "depriv[ing] the jury of its opportunity to be presented with [his] denial of all the allegations and his insistence of [the d]efense's theory of AM. fabricating the allegations." (*Id.* at 43–44.)

The state postconviction court denied this claim on the ground that "the testimony [McGuire] describe[d] would not have changed the outcome of the trial." (Doc. 19, Ex. 21a, at 910.) The court noted that McGuire had "already denied all of the allegations by pleading not guilty," and that the jury was "instructed that they should not be influenced in any way by [his] decision not to testify." (*Id.*) Furthermore, McGuire's counsel "zealously argued that [A.M.] made up the allegations." (*Id.*) For that reason, the court concluded that McGuire's "alleged

testimony would not have added any new facts that were not already before the jury, other than his admitted conviction for a crime of dishonesty." (*Id.*) The court also noted that McGuire "offer[ed] no explanation for why the jury would have found him more credible if he had testified." (*Id.*)

The rejection of this claim was reasonable. As the state court pointed out, McGuire's counsel vigorously argued in closing that A.M. lacked credibility because she "ha[d] a history of making up stories, filing false police reports, recanting or admitting she lied, [and] saying things to make her father angry or to spite him." (*Id.*, Ex. 1e, at 692.) Counsel also stressed that A.M.'s credibility was "not only at issue, it is th[e] issue for you to consider." (*Id.*) "Because trial counsel presented a fabrication defense even without [McGuire's] testimony, trial counsel was not ineffective for advising [him] not to testify." *Jenkins v. Sec'y, Dep't of Corr.*, No. 8:18-cv-1643-MSS-AAS, 2021 WL 3550881, at *10 (M.D. Fla. Aug. 11, 2021). Moreover, "if [McGuire] had testified, he would have been subject to cross-examination and the jury would have learned that he had a criminal history, which could have damaged his credibility." *Preston v. Sec'y, Dep't of Corr.*, 745 F. App'x 835, 839 (11th Cir. 2018). Thus, as the state court correctly found, McGuire failed to establish prejudice because he offered no basis to conclude that the jury would have believed his version of events. *See Wilson v. Inch*, No. 19-61879-CIV, 2021 WL 536132, at *12 (S.D. Fla. Jan. 26, 2021) ("Even assuming arguendo that counsel erred in advising him not to testify, Petitioner's presupposition, that the jury would have found him credible, is insufficient to establish a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different." (citation omitted)), *adopted by* 2021 WL 535376 (S.D. Fla. Feb. 13, 2021).

Ground Twelve is denied.

### K. Grounds Thirteen and Fourteen—Failure to Investigate and Object to "Unauthorized Alterations" of Controlled Call

In Grounds Thirteen and Fourteen, McGuire contends that trial counsel was ineffective for failing to investigate and object to the prosecution's allegedly "[u]nauthorized [a]lteration[]" of the "controlled call" A.M. conducted at the police station. (Doc. 1 at 16–17.) During the call, A.M. told McGuire that she had been arrested for shoplifting a home pregnancy test at a Walmart, and that the test indicated she was pregnant. (Doc. 19, Ex. 1d, at 483.) The trial court listened to the recording during a pretrial hearing, ruled that its contents were admissible, and ordered the prosecution to redact the "parts of the tape . . . having to do with [A.M.'s] bruises." (*Id.*, Ex. 1, at 186–88.) McGuire contends that the prosecution subsequently "altered and manipulated" the recording to "suggest [his] involvement in the charged crimes, which were not heard in the original, unredacted version." (Doc. 1 at 17.) According to McGuire, counsel "failed to act and allowed the [altered] recordings to [be] play[ed] for the jury." (*Id.*)

In his Rule 3.850 motion, McGuire pointed to the two "most significant and prejudicial discrepancies" in the recordings. (Doc. 42-1 at 25.) The first involved the following changes, highlighted in bold:

> Pretrial Version: **And** if you are pregnant, then **legally** we have to find out who the father is. We can deal with that and address it, but if you haven't had sex in **months** and you've been having your period, then you probably just didn't do it right.

> Trial Version: **Now** if you are pregnant, then **we don't even** have to find out who the father is. We can deal with that and address it, but if

you haven't had sex in **a month** and you've been having your period, then you probably just didn't do it right.

(*Id.*) The second "discrepanc[y]" involved the following changes, again highlighted in bold:

Pretrial Version: That's what you need to do, because if you **are pregnant** and need an abortion, we should talk about that.

Trial Version: That's what you need to do, because if you **want to talk to me** and you need an abortion, we should talk about that.

(*Id.*) McGuire also attached an exhibit that set forth all of the alleged alterations. (*Id.* at 176–205.)

The state postconviction court rejected this claim on the ground that McGuire "was not prejudiced." (Doc. 19, Ex. 21a, at 901.) The court began by pointing out that "the overwhelming majority of the alleged alterations do not change the meaning of the recording at all, such as a change from 'Got you' to 'Gotcha,' or from 'okay' to 'all right.'" (*Id.*) Turning to the "allegedly prejudicial alterations," the court held that they were "highly ambiguous and d[id] not necessarily imply that [McGuire] was connected to the fictional pregnancy." (*Id.*) The court reasoned that "[b]oth alleged alterations could be construed as [McGuire] expressing concern for his daughter's wellbeing, which would be beneficial for [him] in light of the harsh tone in other parts of the recording." (*Id.*) The court also found that the allegedly altered statements were "insubstantial when placed next to other parts of the recording, in which [McGuire] indicate[d] that he assumed [A.M.] was with the police regarding 'sex or beating you,' and generally indicated that he thought the victim was accusing him of raping or beating her and expressed concern that the call was being recorded." (*Id.* (citations

38

omitted).) Finally, the court noted that these "other parts of the recording" were "the statements the State focused on in closing argument, not the allegedly prejudicial alterations." (*Id.*)

The rejection of this claim was reasonable. To satisfy the prejudice prong under *Strickland*, a petitioner must establish a "reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, "counsel's errors [must be] so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Thus, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96.

Here, the state court reasonably concluded that the majority of the alleged alterations did "not change the meaning of the recording at all."[9] (Doc. 19, Ex. 21a, at 901.) As for the allegedly prejudicial alterations, the court reasonably found that they were "highly ambiguous" and did not "necessarily imply" that McGuire had

---

[9] In addition to the examples cited by the state court, the alleged alterations included a change from "I haven't had a call from a police officer" to "I haven't got a call from a police officer," and a change from "Okay, well, I've got to go" to "Well, I have to go." (Doc. 42-1 at 184, 194.)

impregnated A.M. (*Id.*) Indeed, the statements could be read to suggest that McGuire was "concern[ed] for his daughter's wellbeing." (*Id.*) Moreover, the prosecution did not focus on these statements in closing argument, instead emphasizing other parts of the recording and A.M.'s testimony about the abuse. (*Id.*, Ex. 1e, at 713–16, 721–22, 724–25.) At most, then, the allegedly prejudicial alterations had "an isolated, trivial effect" on the "entire evidentiary picture." *Strickland*, 466 U.S. at 696. Because the court reasonably found that McGuire was not prejudiced by the alterations, he is not entitled to relief on Grounds Thirteen and Fourteen.

## L. Ground Fifteen—Failure to Impeach A.M. with Family-Court Transcript

In Ground Fifteen, McGuire contends that trial counsel was ineffective for failing to impeach A.M. with a "hearing transcript" from a family-court proceeding in which A.M. "den[ied] any misconduct[] by her father." (Doc. 1 at 18.) Instead, according to McGuire, counsel "made only minimal and unsuccessful attempts of impeaching [A.M.] with her previous denial of abuse by her father." (*Id.*)

The state postconviction court reasonably rejected this claim. (Doc. 19, Ex. 21a, at 906.) As the court explained, A.M. "admitted [at trial] the prior statements from the family law proceeding." (*Id.*) Indeed, on cross-examination, counsel asked A.M. several questions about the October 2008 hearing. (*Id.*, Ex. 1c, at 410–16.) Specifically, counsel inquired, "When asked a specific question of any abuse, specifically anything inappropriate your dad had done, you said no, correct?" (*Id.* at 414.) A.M. answered, "Yes." (*Id.*) A.M. likewise conceded that, when asked at

the hearing "what [her] relationship was like with [her] dad," she had said, "[W]e get along really well." (*Id.*) Because A.M. admitted making the allegedly inconsistent statements, there was no basis to impeach her with the family-court transcript. *See Jennings v. State*, 512 So. 2d 169, 172 (Fla. 1987) (holding that "prior sworn statement of state witness" "could not be introduced for purposes of impeachment because [the witness] admitted that he had made the prior inconsistent statements"). Thus, counsel was not deficient as it would have been duplicative of A.M.'s testimony and McGuire cannot establish how he was prejudiced, so Ground Fifteen is denied.

### M. Ground Sixteen—Failure to Impeach A.M. with Deposition Testimony and Statements to Police and School Officials

In Ground Sixteen, McGuire faults trial counsel for not impeaching A.M. with her deposition testimony and several "pretrial statements to police and school officials." (Doc. 1 at 19.) According to McGuire, these statements "contained numerous inconsistencies which were relevant and material to the State's case-in-chief." (*Id.*)

The state postconviction court rejected this claim, reasoning that "most of the statements were either consistent with trial testimony or were introduced using the proper procedure for impeachment," and that counsel "did not prejudice [McGuire] by not introducing the remaining inconsistencies." (Doc. 19, Ex. 21a, at 906.) The court first addressed alleged inconsistencies in A.M.'s statements about what took place in the bathroom. (*Id.*) At trial, A.M. testified that McGuire rubbed her vagina while they were in the bathroom. (*Id.*, Ex. 1c, at 338–39.) During her interviews with law enforcement and school officials, however, A.M. stated that

McGuire touched her breasts and buttocks in the bathroom. (Doc. 42-1 at 38.) The court correctly noted that A.M. admitted on cross-examination that "she may have said that [McGuire] touched her breasts and buttocks" in the bathroom. (Doc. 19, Ex. 21a, at 906; *see also id.*, Ex. 1c, at 401.)

Next, the court addressed an alleged inconsistency between (1) A.M.'s trial testimony that McGuire offered her alcohol so that she could "learn [her] limit," and (2) A.M.'s statement to law enforcement that McGuire poured her shots of whiskey after becoming "furious" that she had "lost her virginity" and "tried alcohol." (*Id.*, Ex. 21a, at 906; *see also* Doc. 42-1 at 38.) The court correctly noted that the jury heard the portion of the police report that contained the allegedly inconsistent statement. (*Id.*, Ex. 21a, at 906; *see also id.*, Ex. 1d, at 611.)

The court then discussed an alleged inconsistency between (1) A.M.'s trial testimony that, the day before the first sexual assault, McGuire invited two friends to the apartment to "drink with him," and (2) A.M.'s statement to law enforcement that McGuire did not "have friends over" at the apartment. (*Id.*, Ex. 21a, at 906; *see also id.*, Ex. 1c, at 327; Doc. 42-1 at 131.) The court concluded that A.M.'s "statement that [McGuire] 'does not have friends over,' which was not in reference to any specific occasion, is not inconsistent with her trial testimony that he had friends over on a specific occasion." (Doc. 19, Ex. 21a, at 906.)

The court turned to an alleged inconsistency about when the second incident occurred. (*Id.* at 907.) At trial, A.M. testified that it took place two days after the first sexual assault. (*Id.*, Ex. 1c, at 351.) In a prior statement to law enforcement, however, A.M. claimed that the second incident took place "approximately one week" after the first. (Doc. 42-1 at 144.) The court correctly

42

noted that the jury heard the portion of the police report that contained A.M.'s prior statement. (Doc. 19, Ex. 21a, at 907; *see also id.*, Ex. 1d, at 612.)

The court next addressed an alleged inconsistency concerning A.M.'s access to the bedroom. (*Id.*, Ex. 21a, at 907.) At trial, A.M. testified that she did not have access to the bedroom at the time of the abuse. (*Id.*, Ex. 1c, at 320.) In a prior statement to law enforcement, however, A.M. claimed that "her father put a lock on the outside of the bedroom door and only let[] her go in the room to get clothes and change." (Doc. 42-1 at 130.) Likewise, A.M. testified at the suppression hearing that she had access to the bedroom to retrieve certain "personal items," including clothes and jewelry. (Doc. 19, Ex. 1, at 64.) The court noted that McGuire "ha[d] not explained how he was prejudiced at trial concerning [A.M.'s] access to the bedroom." (*Id.*, Ex. 21a, at 907.) Thus, according to the court, "[i]mpeaching [A.M.] on this issue, which does not appear to be material to the charges, would not have changed the outcome of the trial." (*Id.*)

Finally, the court discussed an alleged inconsistency between (1) A.M.'s trial testimony that McGuire "seemed happy" the morning after the first sexual assault, and (2) A.M.'s statement to Detective Puglia that McGuire "was very worried that he may have gotten her pregnant." (*Id.*; *see also id.*, Ex. 1c, at 350; Doc. 42-1 at 132.) The court found no prejudice here either, reasoning that Detective Puglia testified on cross-examination that A.M. had told her that "after the first incident . . . her father acted worried that she was pregnant." (Doc. 19, Ex. 1d, at 515; *see also id.*, Ex. 21a, at 907.)

The court acted reasonably in rejecting McGuire's ineffective-assistance claim. As recounted above, it thoroughly evaluated the allegedly inconsistent

statements, ultimately concluding that most "were either consistent with trial testimony or were introduced using the proper procedure for impeachment," and that the failure to introduce "the remaining inconsistencies" did not prejudice McGuire. (*Id.*, Ex. 21a, at 906.) Furthermore, counsel extensively cross-examined A.M. about a variety of topics, including her prior inconsistent statements to law enforcement. (Doc. 19, Ex. 1c, at 393–452; *see also Davis v. Terry*, 465 F.3d 1249, 1256 (11th Cir. 2006) (affirming denial of ineffective-assistance claim because, among other things, "[c]ounsel extensively cross-examined the State's witnesses to show that they were not trustworthy").) To secure relief on this claim, McGuire must show that the state court unreasonably determined that not cross examining A.M. on these particular inconsistencies would not have created "a reasonable probability" that the outcome would have been different at trial. Not only has McGuire not shown "a probability sufficient to undermine confidence in the outcome," *Strickland*, at 694, he has not shown that the state court's determination of that failure was unreasonable. Nor has McGuire shown that this conclusion rested on any erroneous factual findings. Thus, the state court reasonably concluded that McGuire failed to establish a viable *Strickland* claim. Ground Sixteen is denied.

### N. Ground Seventeen—Failure to Impeach State DNA Expert

In Ground Seventeen, McGuire contends that trial counsel was ineffective for failing to adequately impeach the prosecution's DNA expert. (Doc. 1 at 20.) As noted above, the DNA expert testified on direct examination that A.M.'s DNA was not found on the sleeping bags she retrieved from the apartment. (Doc. 19, Ex. 1d, at 544–46, 550.) On cross-examination, however, counsel asked the DNA expert

whether "the female was identified" on one of the sleeping bags, and she responded, "Yes." (*Id.* at 551.) Later in the examination, the DNA expert backtracked, stating that she "did not identify any DNA from" A.M. on the sleeping bags. (*Id.* at 553–54.) She then reiterated that she "only had the profile that matched Thomas McGuire," and that she "did not have or observe any additional DNA." (*Id.* at 554–55.) McGuire contends that counsel "allowed . . . a material contradiction to be introduced to the jury, thus implying/confirming that charged crimes actually occurred." (Doc. 1 at 20.)

The state postconviction court rejected this claim for lack of prejudice. It reasoned that the DNA expert's "multiple, unequivocal statements that she did not find [A.M.'s] DNA remove[d] any probability that the seemingly contradictory statement was considered by the jury." (Doc. 19, Ex. 21a, at 909.) The court correctly observed that, during closing argument, McGuire's counsel reiterated "that [A.M.'s] DNA was not found on the sleeping bag," and the prosecution "did not argue" to the contrary. (*Id.*; *see also id.*, Ex. 1e, at 643–55, 678–79, 697–725.) Thus, "counsel's argument to the jury, considering that it was unopposed by the State, was sufficient to dispel any concerns the jury may have had about the contradictory statement." (*Id.*, Ex. 21a, at 909.) In short, the court concluded, there was "no probability that the outcome of the trial would have changed had counsel impeached [the DNA expert] on this issue." (*Id.*)

The rejection of this claim was reasonable. To show prejudice under *Strickland*, a petitioner must establish a "reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. McGuire failed to make the required showing. To be sure, the DNA expert

apparently misspoke when she testified that A.M.'s DNA was found on the sleeping bag. But, as the state court pointed out, the expert stated several times that she did not, in fact, locate A.M.'s DNA on any of the items. And McGuire's counsel emphasized during closing argument that "[t]here was no skin, no hair, no saliva, nothing that matched [A.M.] on" the sleeping bags. (Doc. 19, Ex. 1e, at 679.) The prosecution did not contradict this assertion during its closing argument. At most, the DNA expert's misstatement "had an isolated, trivial effect" on the "entire evidentiary picture." *Strickland*, 466 U.S. at 696. That is insufficient to establish prejudice. Accordingly, Ground Seventeen is denied.

### O. Ground Eighteen—Failure to Move for Mistrial

In Ground Eighteen, McGuire argues that trial counsel was ineffective for failing to move for a mistrial based on A.M.'s alleged "misidentification of the physical evidence alleged to be connected to the charged crimes." (Doc. 1 at 21; Doc. 42-1 at 40.) At trial, A.M. initially testified that McGuire had moved multiple pieces of "bedding" into the living room. (Doc. 19, Ex. 1c, at 343.) She identified a green sleeping bag as one of those items, noting that McGuire had placed her on top of it—and other unspecified pieces of "bedding"—during the first sexual assault. (*Id.* at 343–45.) The prosecution's DNA expert subsequently testified that she had identified McGuire's semen on the blue sleeping bag, but not the green one. (*Id.*, Ex. 1d, at 544–46.) After the expert finished testifying, the prosecutor informed the court that he had forgotten to ask A.M. to identify the blue sleeping bag. (*Id.* at 556.) He explained that A.M. "had said that both of the[] [sleeping bags] were in the stack." (*Id.*) The prosecutor then recalled A.M., who (1) identified

McGuire's blue sleeping bag and (2) testified that McGuire had placed it on the floor of the living room on the night of the first sexual assault. (*Id.* at 559.)

In his Rule 3.850 motion, McGuire asserted that "[t]here [was] a reasonable likelihood that this 'mess' was sufficient grounds for [a] mistrial," and thus counsel was ineffective for failing to make the motion. (Doc. 42-1 at 41.) He also claimed that, "[i]f nothing more, this misidentification could/would have assisted with providing legitimate, scientific proof that A.M. was fabricating the allegations." (*Id.* at 41–42.)

The state postconviction court rejected this claim. (Doc. 19, Ex. 21a, at 908.) It recounted the testimony described above and concluded that A.M. "did not misidentify the sleeping bag—she identified multiple sleeping bags as both being involved in the incident." (*Id.*) The court held that McGuire had failed to "allege any specific legal basis for a mistrial on these facts, and none [was] apparent to the [c]ourt." (*Id.*) The court also noted that "[t]he only 'mess' that was created was that the State had to . . . recall a witness out of turn." (*Id.* at 908–09.) And the court rejected McGuire's assertion that "this testimony was ripe for cross-examination, as all of the testimony [was] consistent." (*Id.* at 909.) Thus, the court concluded, "counsel was not deficient because [] a motion [for a mistrial] would have been meritless," and McGuire "was not prejudiced because cross-examination on this issue would not have changed the outcome of the trial." (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Here, whether

a mistrial would have been granted in these circumstances is a matter of Florida law. *See Fernandez v. Sec'y, Dep't of Corr.*, No. 8:16-cv-2565-CEH-SPF, 2019 WL 3958269, at *8 (M.D. Fla. Aug. 22, 2019) ("Whether a motion would have succeeded under Florida's standard for granting a mistrial is a question of state law."). By ruling that a motion for a mistrial would have been denied, the state court "already has told us how the issue[] would have been resolved under state law." *Herring*, 397 F.3d at 1354–55. This Court is bound by that determination.

Furthermore, the state court reasonably concluded that the testimony at issue was not "ripe for cross-examination." (Doc. 19, Ex. 21a, at 909.) As the state court correctly explained, A.M. "did not misidentify the sleeping bag—she identified multiple sleeping bags as both being involved in the incident." (*Id.* at 908.) Thus, there is no basis to conclude that A.M.'s testimony "could/would have assisted with providing legitimate, scientific proof that A.M. was fabricating the allegations." (Doc. 42-1 at 41–42.) Ground Eighteen is denied.

### P. Ground Nineteen—Failure to Seek Dismissal of Child-Abuse Charge

Finally, in Ground Nineteen, McGuire contends that trial counsel was ineffective for failing to move for dismissal of the child-abuse charge. (Doc. 1 at 22–23.) The amended information charged McGuire with one count of child abuse, alleging that between July 8 and September 15, 2008, he "knowingly or willfully abuse[d]" A.M. "by committing an intentional act that could reasonably be expected to result in physical or mental injury to [her] but without causing great bodily harm, permanent disability, or permanent disfigurement." (Doc. 19, Ex. 1, at 9.) Counsel subsequently moved for a statement of particulars as to the child-abuse count, arguing that the amended information failed to allege "specific acts

or incidents." (*Id.* at 11.) The prosecution filed a statement of particulars, which alleged that during the relevant timeframe, McGuire "told A.M. of the sexual acts he performed on [her]," "provided alcohol to [her]," "forced [her] into physical affection such as touching and kissing," and "had [her] perform sexually suggestive acts and masturbated in [her] presence."[10] (*Id.* at 12.)

McGuire argues that the statement of particulars "still failed to inform [the] [d]efense" of the allegations against him. (Doc. 1 at 22.) Thus, according to McGuire, the prosecution "was in willful violation of the rules of discovery." (Doc. 42-1 at 30.) Yet counsel "neglected to move for dismissal" "due to the vagueness of the State's criminal charge and its [refusal] to specify after formal requests from the [d]efense." (*Id.* at 30–31.) Had counsel done so, the trial court allegedly "would have provided the State one last opportunity to amend or most likely would have dismissed the" child-abuse count. (*Id.* at 31.) Moreover, the failure to seek dismissal allegedly "prevented [counsel] from presenting an adequate defense." (*Id.*)

The state postconviction court rejected this claim. (Doc. 19, Ex. 21a, at 903.) First, it held that "counsel was not deficient because the State's statement of particulars was sufficient." (*Id.*) The court noted that "[t]he statement of particulars specifically described the date of and other material facts relating to the child[-]abuse charge." (*Id.*) Second, the court ruled that McGuire was "not prejudiced" because he "admit[ted] that the [c]ourt may not have dismissed the charge and may have allowed the State to amend." (*Id.*) Third, the court rejected McGuire's

---

[10] The prosecution later filed a second amended information, but the child-abuse count was unchanged. (Doc. 19, Ex. 1, at 22–23.)

assertion that "he was unable to present an adequate defense without another statement of particulars," explaining that he "offer[ed] no suggestion of how his defense would have changed with a more complete statement." (*Id.*)

The court acted reasonably in rejecting this claim. As noted above, "although the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Here, the state court found that counsel was not ineffective for failing to seek dismissal because "the State's statement of particulars was sufficient" under Florida law. (Doc. 19, Ex. 21a, at 909.) Thus, the state court "already has told us how the issue[] would have been resolved under state law had [counsel] done what [McGuire] argues [s]he should have done." *Herring*, 397 F.3d at 1354–55. This Court must defer to that determination. *See Files v. Tucker*, No. 3:09-cv-490-RV-EMT, 2011 WL 6983135, at *26 (N.D. Fla. Dec. 9, 2011) ("In light of the state court's determination that defense counsel had no meritorious basis for arguing that the information was subject to dismissal as vague or indefinite, Petitioner failed to show deficient performance or prejudice."), *adopted by* 2012 WL 83369 (N.D. Fla. Jan. 11, 2012); *Anderson v. Sec'y, Dep't of Corr.*, No. 8:09-cv-2083-EAK-EAJ, 2010 WL 4259448, at *16 (M.D. Fla. Oct. 25, 2010) ("[T]he state court's affirmance of the rule 3.850 denial answers the underlying question of whether [petitioner] was entitled to a statement of particulars under Florida law.").

The state court was also correct to reject McGuire's conclusory assertion that he could not prepare an adequate defense without another statement of particulars. McGuire repeats that assertion in his supplemental reply, but he still

fails to explain how additional information about the child-abuse charge would have assisted his defense. (Doc. 37-1 at 38.) Thus, McGuire's claim is conclusory and speculative, which is insufficient to warrant federal habeas relief. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner is not entitled to habeas relief when his claims are merely "conclusory allegations unsupported by specifics"). Ground Nineteen is denied.[11]

## VI.   <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, McGuire must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). McGuire has not made the requisite showing. Finally, because McGuire is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that McGuire's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against McGuire and in Respondent's favor and to **CLOSE** this case.

---

[11] In his supplemental reply, McGuire asserts a claim of cumulative error. (Doc. 37-1 at 61–62.) The claim is waived because McGuire raised it for the first time in his reply. *See Herring*, 397 F.3d at 1342 ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court."). Even if it were not waived, the claim would fail. None of McGuire's claims has merit, so there are no individual errors to accumulate. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (noting that a cumulative-error claim "must fail" where none of the "individual claims of error" has "any merit").

**ORDERED** in Tampa, Florida on September 22, 2023.

Kathryn Kimball Mizelle
United States District Judge